### SOUTHERN RY. CO. v. ATLANTA NAT. BANK.

#### (Circuit Court of Appeals, Fifth Circuit. January 7, 1902.)

#### No. 1,085.

1. APPEAL—REVIEW—ACTION TRIED TO COURT.

Where a case is tried to the court without a jury, and the facts are undisputed, the only questions reviewable in the appellate court are whether the judgment is supported by the facts found under the pleadings.

2. PLEADING—SUFFICIENCY OF PETITION—GEORGIA CODE.

Under the Georgia Code, which abolishes forms of action, and simply requires a plaintiff to set forth in his petition, in paragraphs, the facts which constitute his cause of action, a petition in an action by the owner of bills of lading to recover the value of the goods represented thereby is sufficient to sustain a recovery where it alleges facts which raised a duty on the part of defendant, into whose possession the goods came by virtue of such bills of lading, to properly deliver them, and shows a breach of such duty by their delivery to another, by which they were lost to plaintiff; and it is not material whether defendant's liability arises upon the contracts or ex delicto.

3. BAILMENT—STOPPAGE OF COTTON IN TRANSIT FOR COMPRESSION—RELATION AND LIABILITY OF COMPRESS COMPANY.

Under rules governing the transportation of cotton by southern railroads which permit it, when shipped from interior points to the seaboard on through bills of lading, to be stopped in transit for compression, the owner of a compress through which cotton is so billed for compression and substitution, who receives it accompanied by manifests which are substantial copies of the bills of lading, and show that they require its delivery at the end of the shipment, to "order notify," takes and holds it subject to their terms, and is liable to the holder thereof for a delivery of the cotton without their production to one not authorized to receive it, by which it is lost to such holder.

Pardee, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the Northern District of Georgia.

This was an action by the Atlanta National Bank, the defendant in error, against the Southern Railway Company, the plaintiff in error, to recover an amount claimed as damages for the wrong delivery of certain bales of cotton. Paragraphs 1 and 2 of the petition described the parties. Paragraph 3 alleged "that the Southern Railway Company has injured and damaged petitioner in the sum of $12,952.37, besides interest, as hereinafter stated." Paragraphs 4, 5, and 6 described the cotton, and whence it started. Paragraph 7 alleged that for each and all of the lots of cotton the receiving carrier issued to the shipper a bill of lading providing for its safe carriage and its delivery to Hamilton, Gibson & Leake, or order, at Norfolk.

Va. Paragraph 8 averred that the Southern Railway Company was one of the lines over which the several lots of cotton were to be transported, and all of the cotton receipted for by the Atlanta, Knoxville & Northern Railway and the Nashville, Chattanooga & St. Louis Railway was by said roads transferred and delivered to said Southern Railway Company at Atlanta, Ga. Paragraph 9: "All of said cotton was shipped care of Bell Street Compress, which was run and controlled by the Southern Railway Company when the cotton was receipted by it." Paragraph 10: "Your petitioner bona fide and in due course of business received the bills of lading as collateral security for the payment of a certain note, and it was on the faith and credit of said bills of lading that said m:ney was advanced, and by reason of said indorsement petitioner became invested with title to said bills of lading and the property covered thereby." Paragraph 11: "Each and all of said bills of lading were indorsed at the time of said transfer by the proper persons to vest full title in petitioner." Paragraph 12: "That defendant, by accepting said cotton, is b: und by the terms of said bills of lading, and contracted thereby to safely deliver said cotton to the order of the consignees." Paragraph 13 averred that the petitioner attached to its petition copies of all of said bills of lading, with the indorsements thereon. Paragraph 14 charged that the defendant wrongfully delivered said cotton at Atlanta, Ga., to Hamilton, Gibson & Leake, without the knowledge or consent of the petitioner, and without the production of said bills of lading, and thereby injured the petitioner in the sum sought to be recovered in this action, namely, $12,952.37, besides interest fr..m April 1, 1898, and all accruing interest at 8 per cent. until paid, being the balance due on said debt; the value of said cotton exceeding the balance due on said debt at the time of said wrongful delivery. Paragraph 15 shows the suing out of an attachment executed by process of garnishment on the Fourth National Bank and the Capital City Bank of Atlanta, the garnishees having made answer unto said process admitting an indebtedness sufficient to satisfy petitioner's demand, closing with a prayer for judgment on its attachment against the defendant company and against the garnishees for the amount of its demand, principal and interest, according to the statute in such cases.

The defendant interposed a general demurrer that the petition showed no cause of action, and demurred specially to paragraph 14 on the ground that there was no such ownership in the plaintiff, as transferee of the bills of lading, as would cause privity to exist between it and the defendant, not a party to the contracts of shipment represented by the said bills of lading; with a motion to strike all allegations above demurred to. The defendant also presented its plea and answer to the different paragraphs of the plaintiff's petition.

By consent of parties, the cause was referred to an auditor "to hear and determine all questions of law and fact therein, and report the evidence and his conclusions to the court, subject to further consideration and revision." Agreeably to this consent order for reference, the case was heard before the auditor, who made his report, announcing his finding thus: "I therefore find that the plaintiff is entitled to recover of the defendant in this case a judgment for the sum of $12,952.37, and interest on said sum from the 1st day of April, 1898, until paid, at the rate of eight per cent. per annum, this being the amount due on the note, and it being agreed that the value of cotton involved is in excess of this amount." The defendant submitted exceptions, which were overruled by the auditor, and the report and the exceptions were submitted to the court for consideration and revision. The questions raised by the exceptions to the auditor's report were fully argued before the court, and, after taking time to consider, the court made a partial announcement of its views, and asked to hear counsel briefly further on two questions; that is: (1) As to the right of recovery against the defendant as a warehouseman; and (2) can such recovery be had under the pleadings in the case? On January 23, 1901, the trial judge filed his opinion (106 Fed. 623) showing his conclusions as to the questions raised, and announced that "the exceptions to the report of the auditor will be overruled, and the report confirmed." The defendant having petitioned for a rehearing on the exceptions to the auditor's report, the circuit court, on February 28,

1901, made its order, stating: "The above petition for rehearing has been read and considered, and the same is hereby approved and granted. It is ordered that plaintiff's counsel appear before me on the 1st day of March, 1901, to show cause why the order overruling defendant's exceptions to the auditor's report should not be revoked, and why the said exceptions should not be sustained; this order to operate as a supersedeas to preserve all the rights of the defendant until the rehearing is had, and until further order of the court is made." On March 8, 1901, counsel for the plaintiff and the defendant by a written stipulation "waive trial by jury, and agree that the court may pass upon the law and the facts without the intervention of a jury." Thereafter the circuit court announced its conclusions and judgment, confirming the auditor's report substantially in the following language:

"The above-stated case has been submitted to the court by stipulation in writing for the court to enter a judgment therein on the law and facts without the intervention of a jury. The suit was originally brought by attachment in the city court of Atlanta, the attachment being executed by service of summons of garnishment on the Fourth National Bank of Atlanta and the Capital City Bank of Atlanta, which summons of garnishment was answered by the garnishees, each admitting indebtedness in amounts more than enough to pay the debt sued for. The declaration in attachment was filed in the city court, which sets forth plaintiff's cause of action by petition and in paragraphs, as provided by the statutes of this state. Afterwards the defendant, being the foreign corporation, removed the case to this court, and the record was duly filed, containing, in addition to the attachment and declaration in attachment and garnishments issued in the case, the bond given by the defendant corporation dissolving the garnishments. The suit is brought by the plaintiff against the defendant to recover the value of a large amount of cotton, which it is alleged the defendant received under and by virtue of through bills of lading requiring it to transport said cotton to Norfolk, Va., and there to deliver it to 'order notify Hamilton, Gibson & Leake.' The bills of lading covering the cotton directed that said cotton should be transported to Norfolk, Va., via the Bell Street Compress, Atlanta, Georgia. The petition alleges that the plaintiff is the holder, bona fide, for value, of all of said bills of lading, and was therefore the owner of the cotton represented by said bills of lading; that it had received these bills of lading in regular course of business as collateral security for a note made by Hamilton, Gibson & Leake. It further sets out that the defendant failed to transport said cotton as provided by said bills of lading to Norfolk, Virginia, but, on the contrary, delivered all of said cotton at the Bell Street Compress, in the city of Atlanta, to Hamilton, Gibson & Leake, without requiring the production of the bills of lading, and in violation of the terms of said bills of lading, which required that said cotton should be delivered at Norfolk, to order notify. Petitioner further alleges that the Bell Street Compress in the city of Atlanta, at the time of such wrongful delivery of said cotton to Hamilton, Gibson & Leake, was owned and operated by the defendant, the Southern Railway Company. The petition alleges that the defendant, by accepting said cotton, was bound by the terms of said bills of lading, and contracted as a common carrier to safely transport and deliver said cotton at its destination to order of consignors according to the tenor of said bills of lading and the indorsements on the same; but the defendant, not regarding its duty in that behalf, neglected and failed to transport and deliver said cotton according to its contract, but, on the contrary, wrongfully delivered said cotton at Atlanta, Georgia, to Hamilton, Gibson & Leake, without the knowledge of petitioner, and without its consent, and without the production of said bills of lading so held by the petitioner; and that by reason of the failure of defendant to so transport and deliver said cotton to petitioner according to the bills of lading said defendant has injured and damaged plaintiff in the sum of $12,952.37, besides interest from April 1, 1898, and all accruing interest at eight per cent. until paid, being the balance due on the debt to secure which said bills of lading were duly transferred to the plaintiff.

"The defendant filed a demurrer in said cause, which was not insisted on; and also a plea and answer, in which it denied its liability as a carrier on

account of said bills of lading, denied that it has received the cotton as a common carrier, and denied its liability either as a common carrier or in any other capacity. The defendant, while not insisting on its demurrer, did insist that there could be no recovery against it under the plaintiff's declaration, for the reasons which will be hereafter stated.

"This is a general statement of the issue made by the pleadings. The following are the facts in the case:

"The plaintiff was the bona fide holder, for value, of the bills of lading introduced in evidence, at the time the suit was filed in the city court by it. There is some doubt in the evidence as to the exact time at which the bills of lading which are the basis of this suit were received by the plaintiff; but the evidence all tends to show that the bills of lading were received by the plaintiff within a few days after they were issued, and, whether in its possession at the time the cotton was delivered at the Bell Street Compress or not, they had gotten into its possession before the cotton finally left the Bell Street Compress and was delivered without the pr duction of the bills of lading, according to the plaintiff's contention. The bank had taken on October 1, 1897, a note from Hamilton, Gibson & Leake for $30,000, due on demand, and money was advanced to them from time to time, or their checks paid, which were secured from time to time, and probably from day to day, by bills of lading covering shipments of cotton shipped to Atlanta and shipped out of Atlanta. A large amount of cotton covered by bills of lading which the bank held was found to be still at the Bell Street Compress, and was sold by the compress, and the proceeds credited on the note held by the plaintiff, reducing the amount of the plaintiff's claim to the sum sued for. Fifteen of the bills of lading on which this suit was brought were issued by the Atlanta, Knoxville & Northern Railway, and two of said bills of lading were issued by the Nashville, Chattanooga & St. Louis Railway or the Western & Atlantic Railroad Company. A small amount of cotton was covered by bills of lading issued by the Southern Railway Company itself, and as to this the railroad company admits its liability, because it itself issued the bills of lading; and there is no controversy whatever in this case as to that cotton. All of the bills of lading recited in the usual form the receipt of the cotton from the shippers, and provided that the cotton was to be shipped to Norfolk, Virginia, and delivered to order notify Hamilton, Gibson & Leake, via Bell Street Compress, Atlanta, Georgia. The original bills of lading are shown in the record. All of the cotton covered by the bills of lading was brought to Atlanta by the Nashville, Chattanooga & St. Louis Railway or the Western & Atlantic Railroad (except the small amount brought by the Southern Railway, which is not in controversy) either as the initial carrier or as the intermediate carrier, and all the cars containing the cotton in controversy were delivered by the Western & Atlantic Railroad at Atlanta to the Southern Railway Company. The receipts of the Southern Railway Company to the Western & Atlantic Railroad Company are in the record. All of the cars were by the Southern Railway Company hauled to the Bell Street Compress, and there delivered to the compress. Contemporaneously with the delivery of the cotton to the compress, the Western & Atlantic Railroad Company delivered manifests of the freight waybills to said Bell Street Compress, said manifests being substantial copies of the waybills, which were in turn substantial copies of the bills of lading. In each of said manifests the cotton was described; its destination, Norfolk, Va., was given; and the consignee, order notify Hamilton, Gibson & Leake, was set out. The charges on the cotton were not set out in these manifests.

"The cars containing said cotton, when delivered to the Bell Street Compress, were by the agents of the compress opened, and the cotton therein delivered at the compress to Hamilton, Gibson & Leake by the agents of the compress in this way: Each cotton house in Atlanta had what is called a 'compartment,'—that is, certain space at the compress,—into which cotton received by it was placed when it first reached the compress. The purpose of this cotton going into the compartment was for classification and substitution. The evidence is not clear as to whether the destination of the cotton was changed, or when it was changed, if such change was made;

but the evidence of J. D. Turner and C. T. Turner is to the effect that Hamilton, Gibson & Leake would notify the persons in charge of the compress that they wished a certain number of bales of cotton compressed, which was to be sent to a certain point designated in the notification. It seems to be a fact that in this way the destination of the cotton was changed between the time it reached the compress and the time it was taken out of the compartment. The cotton was shipped via the Bell Street Compress for the purpose of compression and substitution in order to facilitate transportation. After being so compressed, it was by the agents of the compress delivered by loading sheets to Hamilton, Gibson & Leake, and again shipped; but where to it does not clearly appear in the evidence, but the fair inference from the evidence is that the destination of said cotton was by Hamilton, Gibson & Leake changed at the compress. The delivery of the cotton to Hamilton, Gibson & Leake by the agents of the compress was without the knowledge of the plaintiff, and without requiring the production of the outstanding bills of lading covering the cotton. The Bell Street Compress, at the time the cotton was received by it and compressed and delivered to Hamilton, Gibson & Leake, was owned, controlled, and operated by the Southern Railway Company; not a separate corporation, but simply as its property, the railway company receiving from the compress the net profits arising from the business. It is admitted that the value of the cotton delivered to Hamilton, Gibson & Leake, as aforesaid, is more than the amount of the debt sued for. The uniform and universal rule and method adopted by carriers in the transferring of freight from one to another was shown to be as follows: The initial carrier executed and delivered to the shipper a bill of lading in the usual form; sometimes, where it was a through shipment, routing the freight the entire way from the initial point to destination,—but in this case not routing the freight, but simply providing that it should be transported to Norfolk, Virginia, as the destination, and there delivered to order notify. There were three lines of railway from Atlanta to Norfolk competing for freight besides the Southern Railway. When said bills of lading were delivered to the shipper, a waybill was made out, which was a substantial copy of the bills of lading, which waybill was given to the conductor of the train containing the freight, for his guidance. At the terminus of the initial road an abstract of the waybill was made at its freight office, and a charge made of said waybill and abstract against the connecting carrier, whereupon said abstract and waybill were sent to the freight officials of the connecting carrier as evidence of the fact that said freight was routed over its line. When the cotton was delivered in Atlanta, the initial carrier, the Western & Atlantic Railroad Company, did not notify the Southern Railway in this accustomed method of the fact that it was a connecting carrier of the cotton, but simply delivered the cars to the Southern Railway with transfer slips attached to each car, and the Southern Railway tracked the cars to the Bell Street Compress, receiving for such service and trackage from the Western & Atlantic Railroad Company $1 a car. (The transfer slips and receipts by the Southern Railway Company to the Western & Atlantic Railroad Company for the $1 per car are in evidence.) It was also shown that it was the usual and necessary custom, where railroads connecting in Atlanta, or delivering freight in Atlanta, had no track either to where the freight was to be delivered or taken from, for the railroad company which did own the track to such place to be employed as transfer company to track the freight, receiving for such service no part of the freight charges, but simply a stipulated sum for such trackage service, paid by the carrier. It was also shown by the defendant that the agents of the compress, by the custom and practice prevailing among the railroads, the patrons of said compress, and the shippers or consignors of the cotton, delivered all cotton going to the compress to said shippers for the purpose of classification, substitution, marking, etc., and that the compress received from shippers or consignors the cotton so classified, and compressed the same, and redelivered it to the consignors or shippers for reshipment, and issued to said consignor loading sheets, and that the agents of the compress did not require the production of the outstanding bills of lading, but delivered the

112 F.—55

·cotton regardless ·of· said outstanding bills of lading. ·At least, this was the practice at the compress between it, the railroads, and the consignors of the cotton up to the time of the transaction complained of by the plaintiff. But since the trouble growing out of this transaction this rule has been changed, and now the agents of the compress are required, bef. re delivering the cotton for shipment, to take up the outstanding bills of lading. An agent of one of the railroads centering in Atlanta testified that his road never delivered cotton to the compress on through bills of lading without first requiring the production of the bills of lading; and the agent of another road testified that he, as agent, required the agents of the compress to take up his outstanding bills of lading before delivering the cotton for reshipment. The court finds the fact to be, however, that, as a general rule, the persons in charge of the compress delivered cotton to the shippers, prior to the transaction in question, without requiring the production of the bills of lading.

"On the question of handling cotton at the compress in the city of Atlanta there was introduced these two rules adopted by the Southern Railway & Steamship Association, ·which was composed of the railroads centering in Atlanta:

" 'Rule 3. Through shipments of cotton covered by· through bills of lading and waybills may be stopped in transit for compression, or for compression and substitution, and afterwards reshipped on the basis of a through rate from original point of shipment to final destination, provided the cotton is not held at the compress point for more than sixty days.

" 'Rule 4. The destination of such cotton may be changed after reaching the compress point upon surrender of the original bills of lading, and new bills of lading may be issued to correspond to changed destination,· and through rate from initial point of shipment to final destination at the time of shipment to be strictly maintained.'

"The material facts which the court finds in this case, and which it considers controlling, are that all of the cotton in question was shipped, as shown by the bills of lading, via Bell Street Compress, Atlanta, and that the manifests which accompanied the cotton in question into the compress showed that it was shipped to 'order notify,' which by the custom among railroads indicated to any one familiar with such matters that the bills of lading were outstanding in the hands of others than the shippers or consignee, and the further fact that the cotton was unquestionably allowed to go out of the compress without the production of the bills of lading.

## "Conclusions of Law.

"(1) The defendant is not liable to the plaintiff so far as the transfer of the cotton from the Western & ·Atlantic Railroad depot to the compress is concerned. Its duty in this respect was simply to track the cotton from the Western & Atlantic Railroad depot to the compress, and there deliver it; and this duty it performed. There cannot be, in any view of the case, a liability against the defendant on account of this service.

"(2) There is no liability on the part 'of the defendant company to the plaintiff either as a connecting or a common carrier. Any duty the defendant owed the plaintiff as to the transfer of this cotton was discharged. As an ·outgoing carrier it assumed no duty, the evidence all showing that the cotton could have been routed out by any road entering Atlanta.

"(3) The defendant is liable to the plaintiff as a compress ·company. The reasons for this last conclusion are fully given in the opinion filed on January 23, 1901, on the hearing of exceptions to the report of the auditor, to whom this case was referred.

"The court is of opinion, therefore, that the plaintiff is entitled to recover of the defendant, and it is ordered that the plaintiff do recover of the defendant, the, sum of twelve thousand nine hundred and fifty-two dollars and thirty-seven cents ($12,952.37) principal, with interest thereon at the rate of eight per cent. per annum from April 1, 1898, and costs of court.

"Wm. T. Newman, U. S. Judge.

·    "This March 27, 1901."

On March 30, 1901, the circuit court rendered its judgment that the plaintiff recover of the Southern Railway Company the sum of $12,952.37 principal, together with the sum of $3,105.33 interest up to that date, and together with all accruing interest on said principal at 7 per cent. per annum until paid; to which finding and judgment of the court the Southern Railway Company excepted, and to reverse which sued out this writ of error.

P. H. Brewster and Saunders McDaniel, for plaintiff in error.
B. F. Abbott, for defendant in error.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

McCORMICK, Circuit Judge, after stating the case as above, delivered the opinion of the court.

It appears from the report of the auditor and the opinions of the trial judge that the defendant did not insist on its demurrer to the petition, but did insist that there could be no recovery against it under the plaintiff's declaration. The defendant joined issue on the merits by plea and answer, in which it denied its liability as a carrier on account of the bills of lading, denied that it had received the cotton as a common carrier, and denied its liability either as a common carrier or in any other capacity. The report of the auditor states, "There are no controverted facts in the case." And in the exceptions to that report filed by the defendant it is admitted that this statement of the auditor is true, but it is insisted that, although the facts are not controverted, certain conclusions reached by the auditor from these facts are erroneous, and not authorized by them. Also, in its assignment of errors, in the second paragraph, it is recited, "The evidence of the case not being in conflict;" and also in paragraph 3 there is the recitation, "as the evidence was not in conflict." It is manifest that there was no ruling by the auditor, or by the court in reviewing the auditor's report, in relation to the introduction or rejection of evidence to which the railway company excepted. As the case was tried without a jury, there could be no exception taken in the circuit court, nor can there be in this court, to any propositions of law announced by the judge as having been held by him in his consideration of the evidence and reaching his conclusions or special findings of fact therefrom. Jennison v. Leonard, 21 Wall. 302, 22 L. Ed. 539; Norris v. Jackson, 9 Wall. 125, 19 L. Ed. 608; City of Key West v. Baer, 13 C. C. A. 572, 66 Fed. 440, 30 U. S. App. 140.

There are two questions of law in this case: (1) Are the pleadings of the plaintiff sufficient to support the judgment? (2) Do the facts found by the trial judge support the judgment?

As to the first question, the auditor says in his report:

"In Georgia, where all formal distinctions between actions have been abolished by statute, and where the plaintiff is simply required to set forth by petition and in paragraph his cause of action, the question whether the declaration is one in assumpsit on the contract or is one on the case for wrongful conversion of cotton is not of practical importance."

And the learned trial judge, in reviewing the report of the auditor, referring to this subject, says:

"The system of pleading in Georgia now is very liberal, and, this being an action at law, that liberality will be fully recognized in this court. I think

that, taking this declaration altogether, the plaintiff has plainly and distinctly set forth his cause of action, sufficiently so, at least, at the present stage of the case, and after a finding thereon by the auditor."

A careful examination of the provisions of the Georgia Code on the subject "Of Actions," tit. 4, §§ 4729, 4960, 4961, and 4995, with the related sections, which we do not deem it necessary to cite, has satisfied us that the views expressed by the auditor and by the eminent judge of the circuit court are fully sustained by the terms of the Georgia statutes and the decisions of the supreme court of that state. We consider, therefore, that, the plaintiff having plainly and distinctly set forth its cause of action in separate successively numbered paragraphs as authorized and required by the Georgia Code, the petition is sufficient to support the judgment.

Are the facts found sufficient to support the judgment? We are embarrassed by the state of the record in our effort to hold in view or set out with clearness the facts found by the trial judge. On the same day that he approved the writ of error bond (May 25, 1901) he caused to be entered in the case an order "that the opinions rendered by the court in the above-stated cause be, and the same are hereby, made a part of the record in said cause." And on the bill of exceptions that day presented by the railway company, he indorsed: "I do certify that the foregoing bill of exceptions is true, and, together with the record and opinion of the court, contains all the evidence, rulings, and decisions of the court material to a clear understanding of the errors complained of; and the clerk of said court is hereby ordered to file the same as a part of the record of said cause." It cannot be that the many pages of record matter to which this certificate refers are to be received and considered by us as the special findings of fact, and it may well be doubted if, under the conditions in which the case was tried in the circuit court, it is our duty to thresh through all this matter and winnow out the special findings which it may contain. If so, it is very difficult to distinguish between a review of such a judgment on writ of error and a review on appeal of a decree passed in equity.

Waiving any question on this subject, it sufficiently appears that the trial judge did find: That the plaintiff bank had taken a note from Hamilton, Gibson & Leake for $30,000, due on demand; had advanced them money from time to time, and paid their checks, which were secured from time to time by bills of lading covering shipments of cotton shipped to Atlanta and shipped out of Atlanta. That the plaintiff bank was the bona fide holder, for value, of the bills of lading (attached to the plaintiff's petition) at the time the suit was filed in the city court by it. That these bills of lading were received by it within a few days after they were issued, and, whether in its possession at the time the cotton was delivered to the Bell Street Compress or not, they had gotten into its possession before the cotton finally left the Bell Street Compress. That all of these bills of lading recited in the usual form the receipt of cotton from the shippers, and provided that the cotton was to be shipped to Norfolk, Va., and delivered to "order notify" Hamilton, Gibson & Leake, via Bell Street Compress, Atlanta, Ga. That the Bell Street Com-

press, at the time this cotton reached it, was owned, controlled, and operated by the Southern Railway Company, not as a separate corporation, but simply as its property; the railway company receiving the net profits arising from the business. That all of the cotton covered by the bills of lading was brought to Atlanta by other carriers, and all the cars taking the cotton in controversy were delivered at Atlanta to the Southern Railway Company, and receipted for by it, and hauled or tracked by it to the Bell Street Compress, and there delivered to the agents or servants of the Southern Railway Company then in charge of the custody and operation of the compress, accompanied by manifests of the freight waybills, substantial copies of the waybills, which, in turn, were substantial copies of the bills of lading, in each of which manifests the cotton was described, its destination, Norfolk, Va., was given, and the consignee, "order notify" Hamilton, Gibson & Leake, was set out. The charges on the cotton were not set out in these manifests. That when these cars reached the compress the agents and servants of the railway in charge of the compress opened the cars, and placed the cotton in a certain space or compartment within the compress set apart to Hamilton, Gibson & Leake, the purpose of which was for classification and substitution by Hamilton, Gibson & Leake, who would then notify the persons in charge of the compress that they wished a certain number of bales of cotton compressed, which was to be sent to a certain point designated in the notification; and in this way the destination of the cotton was changed between the time it reached the compress and the time it was taken out of the compartment.

On the question of handling cotton at the compress two rules adopted by the Southern Railway & Steamship Association, which was composed of the railroads centering in Atlanta, are as follows:

"Rule 3. Through shipments of cotton covered by through bills of lading and waybills may be stopped in transit for compression or for compression and substitution, and afterwards reshipped on the basis of a through rate from original point of shipment to final destination, provided the cotton is not held at the compress point for more than sixty days.

"Rule 4. The destination of such cotton may be changed after reaching the compress point upon surrender of the original bills of lading, and new bills of lading may be issued to correspond to changed destination; the through rate from initial point of shipment to final destination at the time of shipment to be strictly maintained."

The cotton, after being compressed, was by the agents of the defendant railway in charge of the compress delivered by loading sheets to Hamilton, Gibson & Leake, and again shipped; but where to does not clearly appear in the evidence, but the fair inference from the evidence is that the destination of said cotton was by Hamilton, Gibson & Leake changed at the compress. This delivery of the cotton to Hamilton, Gibson & Leake by the agents of the defendant in charge of the compress was without the knowledge of the plaintiff, and without requiring the production of the outstanding bills of lading covering the cotton. The value of the cotton thus delivered to Hamilton, Gibson & Leake is more than the amount of the plaintiff's debt. The trial judge concludes his findings of fact thus:

"The material facts which the court finds in this case, and which it considers controlling, are that all of the cotton in question was shipped, as shown by the bills of lading, via Bell Street Compress, Atlanta, and that the manifests which accompanied the cotton in question into the compress showed that it was shipped to 'order notify,' which by the custom among railroads indicated to any one familiar with such matters that the bills of lading were outstanding in the hands of others than the shippers or consignee, and the further fact that the cotton was unquestionably allowed to go out of the compress without the production of the bills of lading."

We quote the following language from a decision of the supreme court:

"In ordering judgment for the plaintiff, certain propositions of law are announced by the judge as having been held by him. These are important only as they necessarily and of themselves affect the question whether the facts found are sufficient to support the judgment, and they are no more important than if they had not been thus announced. No specific exception * * *, can be taken to them." Jennison v. Leonard, supra.

The great contention in this case appears to have been over the question whether the railway company, if liable at all, is liable as a carrier or as a warehouseman. It is clear to us from the findings of fact as we have digested them that this question is purely speculative, and its treatment shows a straining after definitions and an indulging in an interesting play on words rather than giving a just consideration to the things actually done and the obligations and liabilities thereby incurred. The Bell Street Compress is a place by which or through which produce may be billed to be carried, and at or in which it may be deposited; but as a physical plant it has no capacity to appoint or have an agent, or to receive or deliver goods that have been carried or are to be carried to or from that place. It is not a person, natural or artificial, that did assume, or could assume, obligations, or incur liabilities. The natural persons in charge of its custody and operation were the agents and servants of the defendant railway,—an artificial person, that was sole owner of the compress plant and sole operator thereof, for its own profit, by and through agents and servants of its own appointing, and by and through whom it could and did assume obligations and incur liabilities; and it seems to us wholly immaterial to the disposition of this case to vex ourselves with the question as to whether the obligations it assumed and the liabilities it incurred were as a carrier or as a warehouseman. There is nothing in the defense that addresses itself, or can address itself, to such a distinction (as, for instance, a plea of limitation or of set-off). The property which the plaintiff owned as security for its debt having been wrongfully delivered to parties not entitled to receive it, and without the consent of the plaintiff, who alone had the right to receive it, the circuit court rightly adjudged that the plaintiff should recover from the defendant the amount of the damage the plaintiff had thereby sustained, which was the amount of its debt, principal and interest at the contract rate up to the date of the judgment, with lawful interest thereafter on the amount of the principal.

The judgment of the circuit court is affirmed.

PARDEE, Circuit Judge. I dissent from the opinion and judgment of the court, but merely outline my grounds. The railway

company was sued as a common carrier for failure to deliver certain cotton according to its contract. The court finds that the railway company made no contract whatever as a common carrier, and is not liable as such carrier; but that it is liable in damages, because it is the owner of the cotton compress that handled the cotton for the carrier. This result is claimed to be justifiable under the alleged liberal pleading prevailing under the Code of the state of Georgia. The cases in the supreme court of Georgia cited as permitting this looseness of pleading, to wit, Railroad Co. v. Pickett, 87 Ga. 734, 13 S. E. 750, and Seals v. Railroad Co., 102 Ga. 817, 29 S. E. 116, were suits against a common carrier, where the contract was admitted, and where the declarations were ambiguous; and the court held that under sufficient facts alleged in the declaration, and in the absence of a demurrer, plaintiff could elect to treat the action as ex contractu or ex delicto. The declaration in this case is not ambiguous, but specifically charges the railway company as liable on a contract as a common carrier, and not otherwise. Irrespective of whether or not, and upon the present pleadings, the railroad company can be held to answer as the owner of a compress, the bank is not entitled to judgment on the facts found by the trial judge. (1) Because there was no privity whatever between the bank and the defendant. (2) Because the compress company was not guilty of any neglect or dereliction of duty in the premises, because, as the case shows, it received the cotton from the responsible carrier, handled it and disposed of it according to the carrier's directions and in accordance with the rules, regulations, and customs controlling the business. Under the contract made between the original consignor and the Western & Atlantic Railroad, the carrier, the cotton was to be delivered to the compress company for classification and substitution as well as for compression, and for such classification and substitution it was understood, and the same was necessary, that the cotton should be delivered to Hamilton, Gibson & Leake, mentioned in the waybills to be notified. The compress company followed the rules and directions usual in such cases, and, in my judgment, is not liable to any one for negligence in the premises, and particularly not liable to the Atlanta National Bank, to whom it owed no duty in the matter. In Railway Co. v. Knight, 122 U. S. 79, 7 Sup. Ct. 1132, 30 L. Ed. 1077, where the identical questions as to pleading and liability as a warehouse were before the court, it was held that, as the suit was brought against the railroad company as a common carrier on bills of lading, no recovery could be had in the action against the defendant as a warehouse company. The court said:

"The suggestion in the charge of the court of a possible ground of liability on the part of the defendant as a warehouseman was entirely outside of the issues. The defendant was not sued upon the ground of any such alleged liability. No facts and circumstances out of which any duty as warehouseman could arise were set out in the declaration. The action was upon the bills of lading alone. The contract alleged to have been made and broken was contained in them. The duty charged to have been violated was the duty of the defendant as a common carrier for an alleged negligence in the transportation of the goods. And if the defendant could be supposed,

upon the facts proven, to have incurred liability in its character as warehouseman, as distinguished from its capacity as a carrier, that liability was not incurred in respect to the plaintiffs. It is not charged that the defendant, as a warehouseman, received any goods as their property for the purpose of storage and safe-keeping. Its relation as a warehouseman was with Potter, and him alone."